Thank you. Good morning, Your Honors. Very simply, I'm Jerry Stockner from Mr. Kamalyan. And I'm pleased to be here. Very simply, I'll get quite to the point, Mr. Kamalyan was in immigration proceedings in San Francisco, ended in 2004. At that time, the immigration judge, I believe it was Ms. Bass, found that Mr. Kamalyan exhibited past persecution. When that happens, it moves to the next stage in DHS. It's in ACFR 1208.13b1i. If the applicant has demonstrated past persecution under paragraph b1 of this section, DHS shall bear the burden of establishing by a preponderance of evidence that the requirements of that section have been met. Preponderance of evidence means there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution. What did they present? They presented two reports, one from the U.S. Department of State, dated 2004 Religious Freedom Report, and the Country Report on Human Rights Practices for 2004, nothing else. Very simply, this Court has said the government is obligated to introduce evidence that on an individualized basis, I think that's the key here, rebutts a particular applicant's specific grounds for his well-founded fear of persecution. This was said in pop of a V.I.N.S. this circuit, 2001. No such evidence was introduced. The judge said, and I'll quote you, while of course basing a change, this is in the record of proceedings, in the judge's decision on page 9, while of course basing a change on country conditions on a change so recent as a month ago is to some extent precarious, this particular change appears to be one that was in the works for some time. Well, that's speculation. I don't know how she knew it was in the works for some time if she only had the Country Report for 2004. She also said, again, this Court has held where past persecution has been established, generalized information from a State Department report on country conditions is not sufficient to rebut the presumption of future persecution. You've said that in Molina-Estrada v. I.N.S., 2002, Roano v. Ashcroft, 2004, recent, and Gouy v. I.N.S., 2002. The judge still relied on these two reports to ascertain country conditions in Armenia. You have said, again, in Garcia-Martinez v. Ashcroft, 2004, we have required an individualized analysis of how changed country conditions will affect the specific Petitioner's situation. The Board in this case did nothing. They had a one-paragraph report – I'm sorry, a one-paragraph decision. They said, quote, we find – we agree with the immigration judge's conclusion that country information, the record concerning Armenia, confirms improved conditions for Jehovah's Witnesses. That's it. So I think, very simply, all you have to look at in this case is the immigration judge's decision. Now I get to the point. Whether, based on the record, the DHS did rebut by a preponderance of evidence the regulatory presumption, whether the record supports this I.J.'s determination that allowing Jehovah's Witnesses to register – and that was the key. In the country report, it said Jehovah's Witnesses will be allowed to register as an organized religion, but that was technically flawed. At the time that the judge made the decision, they were not registered. Whether they're registered now is also speculation. I don't know. At the time, the judge accepted that they could be registering, that the government of Armenia would allow them to register as an organized religion. Further, was that sufficiently tied to Kamalian's fear of persecution to rebut the presumption? At the hearing, his suffering was beatings, stitches, incarceration twice, exorbitant fines. They fined him $1,000, or actually it was a bribe, $1,500, which is a year's wages or so in Armenia. This was serious and severe persecution. He had stitches. He was hospitalized. He had broken ribs. The government categorized that in their brief as mistreatment. I think it goes beyond mistreatment. And then, very simply, you have to look at Jehovah's Witnesses as a complete religious package. It includes Armenian societal hatred. The judge said that. She said, even though the government of Armenia, in her decision, may be softening their stance on organized religion as Jehovah's Witnesses, the society is getting worse. She quoted that. It's getting worse. Further on, refusal to serve in the military, I think, was a key in her case. She said that this was November 2004. She said, from the country report, it is established that in June of the next year, the government of Armenia will enact a conscientious objector provision, which will still be administered by the military. That, again, is speculative. That was seven months before the decision that was enacted. So, again, she's speculating as to the government of Armenia's attitude towards Jehovah's Witnesses in the future and accepted that as a rebuttal to the presumption that was – I'm sorry, to the fact that he was found to have passed persecution. All right. It doesn't mean – in my opinion, it doesn't mean the country report is this positive. It may have rebutted the presumption in the IJ's mind, but Kamilian – and this is key – should have been given the opportunity to prove that there will be continued persecution of himself as a Jehovah's Witness in Armenia. He wasn't given that. It may be an issue of his previous attorney at court, where he didn't present it. They asked the judge, is there anything else? At that time, I would have stepped in and said, yes, you have to give me the opportunity. If you accept the government's position that my past persecution was rebutted, you give me the opportunity to individualize and show you that it wasn't pertinent to me. I think that's clear in the documentation from the Ninth Circuit. They didn't. They just went on. Then we go again, I think, to substantial evidence. The IJ had to explain how generalized assertions in the country reports showing future changes would specifically affect my client. And I think that's Rios v. Ashcroft, 2002, Ninth Circuit. The government did not show that Kamilian would not face religious persecution by others. The judge said, society is getting worse for you guys in Armenia, and you didn't give him – she didn't give him the chance to explain, well, okay, if the government has softened its stance against me, I still think the people, which is the society of Armenia, which the government, again, in essence, doesn't control or doesn't like to control, how does that affect me as well? She didn't give him that opportunity. They didn't show that his fear, the DHS, is not objectively reasonable in light of these proposed, quote, unquote, changes in Armenia. That's a recent case, 2007, Hanavi-Kreisler, and you guys decided that just two years ago. In fact, the IJ stated, using such a recent DOS report is precarious. If it's precarious, that means dangerous. If it's dangerous, don't use it. Should have allowed it to proceed. Then, again, humanitarian asylum. That was another issue in this case. Very simply, they argued matter of Chen. This was done in the briefings, and the judge, again, should have allowed him to go through the two-prong issues in matter of Chen, saying that because he – even if he rebutted the presumption, if the DHS rebutted the presumption, he should have allowed Kamelian to prove that he was entitled to humanitarian asylum. This is a responsibility of the immigration judge. He had severe past persecution. The government labeled it as mistreatment. I label it severe broken ribs, stitches, beatings, and massive fines in an impoverished country. I think it's severe persecution, Your Honor. I think this case has to at least get remanded back so that Kamelian can show if you accept that the government did rebut the presumption, it should be allowed – he should be allowed to show that that is not an individualized determination, Your Honor. Thank you very much. You can reserve two minutes for rebuttal. Okay. Hi. Good morning again. Substantial record – evidence in the record here supports the holding below that country conditions fundamentally changed in Armenia, such that Kamelian no longer had a well-founded fear of persecution based on his Jehovah's Witness religion. Because Homeland Security successfully rebutted this presumption of a well-founded fear, Kamelian was not eligible for asylum or withholding of removal. First, just to address counsel's argument that reliance on the State Department reports and the International Religious Freedom Report was inappropriate or not enough here, this Court's case law is that reliance on these reports is permissible. And in fact, the U.S. Department of State's country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations. And that's in Soey v. Mukasey 2008 case involving a changed country conditions scenario here. And as long as there's an individualized analysis, meaning application of those facts to this individual. And that happened here because Kamelian – first, the immigration judge summarized Kamelian's claim, what he feared. He feared what would happen to him already would happen to him again. What happened to him already were beating – Entitled to the presumption of that. Yes. And so the immigration judge went through those fears and essentially demonstrated through the reports, the information in the reports, that all of those things or bases for which he was fearing future harm had changed. So his claim was that his religion was not legal, meaning it wasn't registered. That's the same thing. He was not allowed to worship in public because it's not legal, so he had to worship at home. Using worship materials were illegal. Based on all of that, because of the illegality of everything that he was doing and proselytizing, he was arrested and beaten and detained. And he feared that if he returned that those same things would happen by the government. The reports, as the immigration judge pointed out, show that at that time,  they hadn't succeeded at that time because of a technical problem, but the reports indicated that the Jehovah's Witness organization was confident they'd work it out and be registered. And Mr. Kamalian even testified on the day of his hearing... But how does that go to the attitudes of the people? I mean, they've been arrested. I mean, he's found, presumed that future persecution will occur. He found that there's past persecution. According to the State Department reports in 2003, it says the government's human rights record remains poor. Talk about discrimination against Jehovah's Witnesses. Why do you think that goes enough to providing an individualized analysis in his case? Because they can register. Because not only can they just register, the reports indicate that the group has succeeded in renting space in order to worship in public spaces, that they were allowed to use materials that were previously determined to be illegal, and also proselytizing laws, anti-proselytizing laws were no longer being enforced at that time, which is an essential element of Jehovah's Witness religion. Are you saying that the State Department said the laws were not being enforced at the time he was applying? By the time he was before the immigration judge, anti-proselytizing laws were not being enforced. According to the State Department. According to the International Religious Freedom Report, I believe it was. No, the State Department country report said that anti-proselytizing laws were not enforced and Jehovah's Witnesses could advocate their beliefs in public on the day that he was testifying before the immigration judge. That's what the report had said. So all of these activities were all of the reasons that in the past he had been persecuted, but these reports directly went to all of his, all of the fears that he testified about. Everything had, all of those things had changed. As for the societal attitudes, that is a different story here, because for asylum, it's whether or not the government is going to be harming or persecuting you or the government is unwilling to step in and help and prevent that. Here we show that the government has been taking measures to permit Jehovah's Witnesses to have more rights, to become legal, to legally practice their religion, and in those reports said that there were no impediments to people practicing their religion, any religion, including Jehovah's Witnesses. And the only reason any Jehovah's Witnesses were in jail was for violation of law, the draft evasion laws. And as the immigration judge pointed out, that, too, was improving. The law had actually passed, according to the reports. I believe counsel misspoke a bit on that. The law had passed, it was, they were waiting on the implementing regulations, but that was in the works at the time. So there had also been an improvement on the front to permit them alternative service by the time he was testifying before the immigration judge. But, again, that's a legal matter. That's not persecution, that's prosecution for violation of a law. And there's a difference, but they were working on it because they understood that Jehovah's Witnesses had a conscientious objection. Well, they had passed the law and they were working on implementing regulations. They had not achieved it at the time. But that was not the crux of the immigration judge's finding, nor was that a basis for Mr. Kamalian's claim of fear of harm if he returned. His only claim of fear was, if I go back, the same thing will happen, meaning police will arrest me for worshiping, police will arrest me for proselytizing, police will arrest me for having materials that were then illegal and they will beat me. But all of those fears that he talked about were dispelled through those country reports because significant material changes had been made within that time that he appeared before the immigration judge. So how do you respond to Petitioner's argument that he did not have an opportunity to present evidence on that particular question? He had an opportunity to present his claim as to what he feared if he returned. He gave full testimony as to what he was afraid would happen. He did not say he was afraid his neighbors would attack him, but again, that's not the standard for asylum. It's whether or not the government will do something or not step in to do something. And based on he had the country reports that he did not object to them being submitted, so he was well aware as to what the reports stated, but he presented his full testimony that what he feared was being arrested for practicing his religion. I think we have your argument. Can I hand any further questions? Okay. Thank you. Thank you. You may have a rebuttal. Your Honor, it's very simply, at the time of the hearing, everything that the judge based her decision on vis-à-vis the country reports was speculative. They didn't have time, and she said it herself, to establish whether or not the government of Armenia would succeed in implementing any regulations they decided to hold as to Jehovah's Witnesses. For instance, the fact of proselytization. Only the Armenian Apostolic Church can proselytize. The fact that they weren't enforcing it, again, is speculative. Armenia is a big country. Police A, police B, police C. It can be enforced. There's still a law against Jehovah's Witnesses proselytizing. That is the basic tenet of their religion. How can you say that that will not be, I'm sorry, will not be enforced if the law exists on the books to enforce it? Secondly, the issue of conscientious objection. That's another basis of the Jehovah's Witnesses religion. They do not serve in the military. The military, under this, at the time, speculative law, to change the rules on military, I'm sorry, on conscientious objection, alternative service, it was handled by the military. I refer you, and again, I don't want to testify, but the 2008 Amnesty International report for January states that 1 percent of the entire population of Armenian Jehovah's Witnesses are imprisoned for failure to respond to this conscientious objection law because the military observes it and they refuse to do anything I mean, the military administers it. They refuse to even go into conscientious objection. That's not prosecution. That's persecution because it's one of the basic tenets of their religion. 1 percent of the 9,000 Jehovah's Witnesses is 92 people. That is probably 12 percent of the entire young population of Jehovah's Witnesses. They're getting sentences of one or two or three years because they refuse to serve in anything handled by the military. So that has not been effective. At the time that the judge dealt with this, it was still speculation. It was not individualized. He was not given an opportunity to explain to the judge how he would suffer fundamentally if these laws were enacted anyway, Your Honor. Thank you. If we remand, what do you want us to tell the judge? Very simply, give him an opportunity. Well, again, it all depends on whether you found that the government met their burden. If the government met their burden, then I would hope that the you would tell the judge to allow him to individually testify and prove that he himself would still have a future fear of persecution. If they hadn't met their burden. I'm sorry, Your Honor? And if we thought they had not met their burden. Then it's done, in my opinion. Then he should be granted asylum because he had a presumed presumption. I mean, there was a presumption that he will suffer future persecution. So it's ended. All right. Thank you. Case is heard. It will be submitted for decision.
judges: Hall, Noonan, Thomas